**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| **KAMAKURA, LLC and ATLÁNTICO,** ) | |
| **LLC, on behalf of themselves and all others** ) | |
| **similarly situated,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No.** |
| ) | **20-11350-FDS** |
| **GREATER NEW YORK MUTUAL** ) | |
| **INSURANCE COMPANY,** ) | |
| ) | |
| **Defendant.** ) | |
| _____) | |

**MEMORANDUM AND ORDER ON**
**DEFENDANT'S MOTION TO DISMISS**

**SAYLOR, C.J.**

This is a dispute concerning insurance coverage.  Jurisdiction is based on diversity of citizenship.

Beginning in March 2020, as the COVID-19 pandemic began to spread across the country, the Commonwealth of Massachusetts issued orders that required restaurants to suspend on-premises consumption of food and drink.  Plaintiffs Kamakura, LLC and Atlántico, LLC operate restaurants in Boston.  They seek a judgment, on behalf of themselves and those similarly situated, that insurance policies issued by defendant Greater New York Mutual Insurance Company ("GNY") cover the losses they sustained following those orders.  They also seek damages for breach of contract and unfair trade practices arising out of GNY's denial of their claims.  GNY has moved to dismiss the complaint for failure to state a claim upon which relief can be granted, contending that the policies on their face do not provide coverage.

The Court is certainly sympathetic to the hardships faced by restaurant owners as a result

of the pandemic.  It also notes that the pandemic is the type of occurrence—a widespread disaster for which a small business cannot possibly prepare—where insurance coverage ought to be routinely available.  Nonetheless, the Court cannot avoid the language of the policies as written.  It therefore joins, albeit with some reluctance, the great majority of courts that has concluded that no insurance coverage is available under these policies for the losses caused by the pandemic.

Accordingly, and for the following reasons, the motion to dismiss will be granted.

## I.   Background

### A.   Factual Background

The following facts are presented as alleged in the complaint unless otherwise noted.

#### 1.   Parties

Kamakura, LLC and Atlántico, LLC are limited liability companies.  (Compl. ¶¶ 11-12). Kamakura operates the Kamakura restaurant, a Japanese-style restaurant located in downtown Boston.  (*Id.* ¶ 17).  Atlántico operates the Atlántico restaurant, a Spanish and Portuguese seafood restaurant located in Boston's South End.  (*Id.* ¶ 18).

Greater New York Mutual Insurance Company ("GNY") is a New York company with a principal place of business in New York.  (*Id.* ¶ 13).  It is licensed to provide property and casualty insurance in Massachusetts.  (*Id.*).

#### 2.   COVID-19 Pandemic

In late 2019 and early 2020, the infectious disease COVID-19 began to spread around the world.  (*Id.* ¶ 22).  The City of Boston announced its first confirmed case on February 1, 2020. (*Id.*).  Later that month, one of the first "super-spreader" events in the United States, a medical conference hosted by Biogen, was held in Boston.  (*Id.* ¶ 23).  That conference alone was linked to at least 100 confirmed cases of COVID-19.  (*Id.*).  Over the course of the following year,

Massachusetts reported more than 550,000 confirmed cases of COVID-19 and more than 16,000 deaths from the disease.  *See* Mass.gov, COVID-19 Interactive Data Dashboard, https://www.mass.gov/info-details/covid-19-response-reporting (last visited Mar. 8, 2021).

According to the World Health Organization, COVID-19 is transmitted "through respiratory droplets, by direct contact with infected persons, or by contact with contaminated objects and surfaces."  (*Id.* ¶ 25 (emphasis omitted)).  It is spread "primarily from person to person through small droplets from the nose or mouth" when people "breathe in these droplets from a person infected with the virus."  (*Id.* ¶ 26).  Airborne transmission is "especially acute" in indoor or enclosed environments, particularly those that are crowded, have inadequate ventilation, or expose individuals to others for extended periods of time.  (*Id.* ¶ 32).

COVID-19 is also spread when respiratory droplets from infected individuals "land on objects and surfaces," and others touch those surfaces and then touch their eyes, nose, or mouth. (*Id.* ¶ 26 (emphasis omitted)).  According to a study published in the New England Journal of Medicine, COVID-19 is detectable for up to six days on certain types of surfaces.  (*Id.* ¶ 28).

To slow the spread of the disease, state and local governments across the country issued orders that, among other things, required residents to "socially distance" and to remain at home unless performing "essential" activities.  (*Id.* ¶ 34).  In Massachusetts, Governor Baker issued an order on March 15, 2020, that suspended "on-premises consumption of food or drink" at restaurants.  (Def. Mem. Ex. 1, at 4; Compl. ¶ 36).[1]  That suspension was extended several times

---

[1] GNY has attached several exhibits, including a compilation of the relevant COVID-19 orders, to its motion to dismiss.  (*See* Def. Mem. Ex. 1).  While ordinarily "any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, . . . courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint."  *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993) (collecting cases).  Each of those exceptions applies to the orders.  Furthermore, and in any event, neither party disputes that the Court may properly consider them.

in March, April, and May 2020.  (Compl. ¶¶ 38, 39, 41-42; Def. Mem. Ex. 1, at 6, 20, 25, 28).

On June 6, 2020, Governor Baker issued an order that permitted restaurants to provide outdoor table service, subject to several restrictions concerning seating capacity, social distancing, and cleaning.  (Compl. ¶ 46; Def. Mem. Ex. 1, at 40).  Two weeks later, he authorized indoor table service to resume under similar restrictions.  (Compl. ¶ 48; Def. Mem. Ex. 1, at 49).

Kamakura and Atlántico, like other restaurants, have been subject to the orders issued by Governor Baker.  (Compl. ¶ 51).  The complaint alleges that the orders and the spread of COVID-19 have had a "devastating effect" on their business.  (*Id.*).  Pursuant to the orders, the restaurants have been limited either to take-out and delivery services, which are not their "normal and primary forms of providing food and beverages," or to restricted levels of on-premises dining.  (*Id.* ¶ 52).  The complaint further alleges that the orders "have operated to prohibit access" to the restaurants.  (*Id.* ¶ 72).  Kamakura and Atlántico have therefore suspended their operations "due to their inability to use their properties for their intended purposes due to COVID-19 and the civil authority orders."  (*Id.*).

### 3.    **The Insurance Policies and the Claims**

Kamakura and Atlántico separately purchased insurance policies from GNY.  (*Id.* ¶¶ 55-56; *see also id.* Ex. 1 ("Kamakura Policy"); *id.* Ex. 2 ("Atlántico Policy")).[2]  The policies provide identical "Business Income," "Extra Expenses," and "Civil Authority" coverage. (*Compare* Kamakura Policy, at 94-95, *with* Atlántico Policy, at 93-94.  The scope of that coverage is defined by the "Business Income (and Extra Expense) Coverage Form."  That form

---

[2] The Atlántico Policy was originally issued to Cheekwein LLC d/b/a Southern Proper Restaurant.  (Compl. ¶ 56).  In January 2020, that restaurant closed, and Cheekwein sold its assets to Atlántico.  (*Id.*).  The policy was then amended to change the named insured to Atlántico.  (*Id.* Ex. 3).

first provides "Business Income" coverage on the following terms:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations.  The loss or damage must be caused by or result from a Covered Cause of Loss.

(Kamakura Policy at 94; Atlántico Policy at 93).  The same form then provides for "Extra Expense" coverage:

> Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

(*Id.*).  It further provides "Civil Authority" coverage:

> When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:
>
> (1)  Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and
>
> (2)  The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

(Kamakura Policy at 95; Atlántico Policy at 94).

The Business Income (and Extra Expense) Coverage Form is a standardized form drafted by the Insurance Services Office ("ISO").  (Compl. ¶ 62).  ISO drafts standard policy language used by insurers in the United States.  (*Id.*).  In November 2006, following the outbreaks of Severe Acute Respiratory Syndrome ("SARS") and H5N1 avian flu, ISO drafted a form exclusion for losses "due to disease-causing agents such as viruses and bacteria."  (*Id.* ¶ 66).

According to the complaint, "many insurers" added that form or a similar exclusion to standard commercial insurance policies.  (*Id.* ¶ 65).  The Kamakura and Atlántico policies, which include multiple ISO forms, do not contain exclusions for viruses or pandemics.  (*Id.* ¶¶ 60-61, 69).

Kamakura and Atlántico submitted claims to GNY seeking coverage for losses sustained due to the COVID-19 pandemic and the resulting orders.  (*Id.* ¶¶ 78, 87).  GNY denied those claims.  (*Id.*).  Its denial letters stated that "there is no physical loss of or damage to your property from a covered cause of loss, nor have the local authorities prohibited access to the area immediately surrounding your property due to damage to property not more than one mile away from your business."  (*Id.* Ex. 4, at 1 ("Kamakura Denial"); *see also id.* Ex. 5, at 1 ("Atlántico Denial")).[3]  They further stated that the orders "do[] not constitute physical loss of or damage to either covered property at the described premises or damage to any property in the surrounding area which would limit access to the insured location."  (*Id.*).[4]

The complaint alleges that the denials are "directly contrary to" the policies because the inability of Kamakura and Atlántico "to use [their premises] to operate [their businesses] as a result of the physical loss of or damage to the [properties] caused by COVID-19 is sufficient to trigger the business income and related coverages."  (*Id.* ¶¶ 80, 89).  It also alleges that GNY denied the claims "without conducting any inspection or review of [the properties] or documents concerning [their] business activities in 2020."  (*Id.* ¶¶ 81, 90).  According to the complaint, because GNY "swiftly" denied the claims "without conducting an appropriate review of the

---

[3] There are minor, non-material differences in the comparable sentences in the Atlántico denial letter.

[4] The Kamakura denial letter also recited the "Ordinance of Law" exclusion in the policies.  That exclusion provides that GNY will not pay for loss or damage caused by "[t]he enforcement of or compliance with any ordinance or law . . . [r]egulating the construction, use or repair of any property; [or] [r]equiring the tearing down of any property, including the cost of removing its debris."  (Kamakura Denial at 4).  It is unclear, however, whether GNY actually relied on that exclusion when disclaiming coverage.

properties," it did not "engage in a good faith or reasonable investigation of the claims . . . ." (*Id.* ¶ 94).

The complaint further alleges that GNY has a "national policy and practice of denying, without investigation, all claims for business income and extra expense coverage and civil authority coverage, based upon the COVID-19 pandemic, including for policies which do not have a virus or pandemic exclusion." (*Id.* ¶ 93). The policy and practice allegedly constitute an effort by GNY "to limit its losses due to the COVID-19 pandemic despite the fact that the GNY policy provided coverage for losses due to loss of use of property and from closure orders issued by civil authorities." (*Id.* ¶ 95).

### B.    Procedural Background

On July 17, 2020, Kamakura and Atlántico, on behalf of themselves and all others similarly situated, filed suit against GNY. The complaint asserts claims for declaratory judgment (Count 1), breach of contract (Count 2), and violation of Mass. Gen. Laws ch. 93A (Count 3). Count 1 and Count 2 are asserted on behalf of Kamakura, Atlántico, and four classes: a Nationwide Business Income and Extra Expense Coverage Class, a Nationwide Civil Authority Coverage Class, a Massachusetts Business Income and Extra Expense Coverage Subclass, and a Massachusetts Civil Authority Coverage Subclass. Count 3 is asserted on behalf of Kamakura, Atlántico, and the Massachusetts subclasses.

GNY has moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## II.    Standard of Review

To survive a motion to dismiss, a complaint must state a claim that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). For a claim to be plausible, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ."

*Id.* at 555 (internal citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

In determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give plaintiffs the benefit of all reasonable inferences.  *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory."  *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

Under Massachusetts law, the interpretation of an insurance contract is a question of law. *See Boston Gas Co. v. Century Indem. Co.*, 454 Mass. 337, 355 (2009).  Courts apply general contract-interpretation principles and construe "the words of the policy in their usual and ordinary sense."  *Dorchester Mutual Ins. Co. v. Krusell*, 485 Mass. 431, 437 (2020) (quoting *Metropolitan Life Ins. Co. v. Cotter*, 464 Mass. 623, 634-35 (2013)).  "Every word in an insurance contract must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable . . . without according undue emphasis to any particular part over another."  *Boston Gas Co.*, 454 Mass. at 355-56 (internal quotation marks and citations omitted).  When in doubt, a court must consider "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered."  *Id.* at 356 (quoting *A.W. Chesterton Co. v. Massachusetts Insurers Insolvency Fund*, 445 Mass. 502, 518 (2005)).

Any ambiguities in an insurance policy "are interpreted against the insurer who used

8

them and in favor of the insured." *Krusell*, 485 Mass. at 437 (quoting *Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London*, 449 Mass. 621, 628 (2007)).  An ambiguity "arises when there is more than one rational interpretation of the relevant policy language," but "is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other." *Boston Gas Co.*, 454 Mass. at 356 n.32 (internal quotation marks and citations omitted).

## III.    Analysis

### A.    Business Income and Extra Expense Coverage

Defendant contends that the complaint fails to state a claim for coverage under the Business Income and Extra Expense provisions.  To state a claim under those provisions, it must allege "direct physical loss of or damage to property" at plaintiffs' restaurants.  (Kamakura Policy at 94; Atlántico Policy at 93).  Defendant contends that the complaint fails to do so because it "does not allege that Coronavirus contaminated Plaintiffs' restaurants or any property within them."  (Def. Mem. at 13 (emphasis omitted)).

#### 1.    "Direct Physical Loss of or Damage to Property"

The Court must first consider the plain meaning of the policy language.  As noted, the policies provide coverage for "loss" or "damage" that is "direct" and "physical."  While those terms are not defined in the policies, taken as a whole, it is clear that the policies do not provide coverage for financial or other intangible losses.  Instead, there must be a "physical" loss of or damage to a tangible object, such as the structure of a building.  *See SAS Int'l, Ltd. v. General Star Indem. Co.*, 2021 WL 664043, at *2 (D. Mass. Feb. 19, 2021) ("[T]hese terms require some enduring impact to the actual integrity of the property at issue.  In other words, the phrase 'direct physical loss of or damage to' does not encompass transient phenomena of no lasting effect, much less real or imagined reputational harm."); *Harvard St. Neighborhood Health Ctr., Inc. v.*

*Hartford Fire Ins. Co.*, 2015 WL 13234578, at *8 (D. Mass. Sept. 22, 2015) (explaining that "[i]ntangible losses do not fit within" the definition of "direct physical loss"); *Eveden, Inc. v. North Assurance Co.*, 2014 WL 952643, at *5 (D. Mass. Mar. 12, 2014) ("Intangible losses, such as a defect in title or a legal interest in property, are generally not regarded as 'physical' losses in the absence of actual physical damage to the property."); *Crestview Country Club, Inc. v. St. Paul Guardian Ins. Co.*, 321 F. Supp. 2d 260, 264 (D. Mass. 2004) (concluding that intangible losses are not "physical" losses and identifying cases where "Massachusetts courts, as well as others elsewhere, have interpreted the phrase 'direct physical loss' in a similarly narrow way"); 10A Couch on Ins. § 148:46 (3d ed. 2020) ("The requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." (footnotes omitted)).

Courts in Massachusetts have adopted that interpretation when considering insurance claims for losses related to the COVID-19 pandemic. *See Legal Sea Foods, LLC v. Strathmore Ins. Co.*, 20-cv-10850, slip op. at 7-9 (D. Mass. Mar. 5, 2021) ("Courts in Massachusetts have had occasion to interpret the phrase 'direct physical loss' and have done so narrowly, concluding that it requires some kind of tangible, material loss."); *SAS Int'l, Ltd.*, 2021 WL 664043, at *3 ("[C]onstruing the language 'physical loss of' to cover the deprivation of a property's *use* absent any tangible damage to the property distorts the plain meaning of the Policy.  Simply put, the Policy does not cover a mere threat to the insured property without any actual physical damage having occurred." (footnote omitted)); *Verveine Corp. v. Strathmore Ins. Co.*, 2020 WL 8766370, at *3 (Mass. Sup. Ct. Dec. 21, 2020) ("The phrase 'direct physical loss of or damage to

property' in a property insurance policy like this one cannot therefore be construed to cover physical loss in the absence of some physical damage to the insured's property.").

It is not entirely clear from the complaint exactly what plaintiffs say caused their "loss of property"—either the threat or presence of coronavirus or COVID-19, the subsequent shutdown orders, or both.  In any event, plaintiffs contend that "physical loss" includes "losses attributable to the presumed or imminent threat of contamination which renders the property unusable for its intended purposes and does not require tangible damage to the physical structure."  (Pl. Opp. at 8).[5]  But the "presumed or imminent threat of contamination" has no physical effect on the property.  *See Verveine Corp.*, 2020 WL 8766370, at *4 ("Equally unavailing is plaintiffs' argument that the COVID-19 virus constitutes an 'imminent threat' to their premises and thus could amount to a physical loss within the meaning of the policies.").  Indeed, courts have held that even the actual contamination of a property does not have the requisite "physical" effect.  *See, e.g.*, *Legal Sea Foods*, slip op. at 8 ("A virus is incapable of damaging physical structures because the virus harms human beings, not property." (internal quotation marks and citation omitted)); *Terry Black's Barbecue, LLC v. State Auto. Mut. Ins. Co.*, 2020 WL 7351246, at *7 (W.D. Tex. Dec. 14, 2020) ("Even assuming that the virus that causes COVID-19 was present at Plaintiffs' properties, it would not constitute the direct physical loss or damage required to trigger coverage under the Policy because the virus can be eliminated.  The virus does not threaten the structures covered by property insurance policies, and can be removed from surfaces with routine cleaning and disinfectant."); *Uncork & Create LLC v. Cincinnati Ins. Co.*, 2020 WL 6436948, at *5 (S.D.W. Va. Nov. 2, 2020) ("[E]ven when present, COVID-19 does not threaten

---

[5] In their opposition, plaintiffs focus on "physical loss," as opposed to "physical damage."  (*See* Pl. Opp. at 6-8 (contending that physical damage is not required to trigger coverage); *id.* at 8-11 (contending that physical loss can occur in the absence of structural damage)).

11

the inanimate structures covered by property insurance policies, and its presence on surfaces can be eliminated with disinfectant.").  The spread of the coronavirus is of course "physical" in the sense that the virus is a submicroscopic organism, but under the plain language of the policy, it is the loss or damage itself that must be "physical."  *See SAS Int'l, Ltd.*, 2021 WL 664043, at *4 n.4 ("[N]o reasonable construction of the phrase 'direct physical loss,' however broad, would cover the presence of a virus.").

That remains true even when the virus's presence or the subsequent government orders "render[] the property unusable for its intended purpose."  (Pl. Opp. at 8).  In *Verveine*, the Massachusetts Superior Court rejected the plaintiffs' contention that because they "could no longer use the premises"—two restaurants in the Boston area—"for their intended purpose" after Governor Baker issued the COVID-19 orders, "they necessarily suffered . . . a 'direct physical loss.'"  *See Verveine Corp.*, 2020 WL 8766370, at *3.  The Supreme Judicial Court has yet to determine whether "physical loss" includes "a property's loss of use stemming from an intangible substance."  *SAS Int'l, Ltd.*, 2021 WL 664043, at *4 n.4.  But the *Verveine* decision reflects the position of an increasingly large majority of courts across the country, which is that restrictions on the use of property by government orders due to the threat or presence of coronavirus do not constitute "direct physical loss" of property.  *See, e.g.*, *Brunswick Panini's, LLC v. Zurich Am. Ins. Co.*, 2021 WL 663675, at *8 (N.D. Ohio Feb. 19, 2021) ("Plaintiffs' claim for loss of full use of their premises and for business interruption is precluded under the Zurich Policy. . . .  Neither the COVID-19 virus nor the state government orders caused 'direct physical loss of or damage to' Plaintiffs' Insured Property."); *Whiskey Flats Inc. v. Axis Ins. Co.*, 2021 WL 534471, at *4 (E.D. Pa. Feb. 12, 2021) ("While the Court agrees that 'loss of' the premises can mean the loss of use, that loss of use must be tied to a physical condition actually

impacting the property, which is not satisfied here.  Plaintiff did not lose use because the premises suffered physical damage; nor was the loss of use caused by actual contamination of the property."); *Karmel Davis & Assocs., Attorneys-At-Law, LLC v. Hartford Fin. Servs. Grp., Inc.*, 2021 WL 420372, at \*5 (N.D. Ga. Jan. 26, 2021) ("[T]he Shelter Order itself did not cause an actual, physical change to Plaintiffs law office. . . .  Rather, the Order only limited Plaintiff in how it could use its law office for the duration of the Order.  These claims for coverage must therefore be dismissed."); *Sandy Point Dental PC v. Cincinnati Ins. Co.*, 2020 WL 5630465, at \*3 (N.D. Ill. Sept. 21, 2020) ("In essence, plaintiff seeks insurance coverage for financial losses as a result of the closure orders.  The coronavirus does not physically alter the appearance, shape, color, structure, or other material dimension of the property.  Consequently, plaintiff has failed to plead a direct physical loss—a prerequisite for coverage." (footnote omitted)).[6]

Plaintiffs nonetheless point to the First Circuit's decision in *Essex Insurance Co. v. BloomSouth Flooring Corp.*, 562 F.3d 399 (1st Cir. 2009), and two unreported decisions from Massachusetts Superior Court, *Matzner v. SEACO Insurance Co.*, 1998 WL 566658 (Mass. Sup. Ct. Aug. 12, 1998), and *Arbeiter v. Cambridge Mutual Fire Insurance Co.*, 1996 WL 1250616 (Mass. Sup. Ct. Mar. 15, 1996).  Those decisions, plaintiffs contend, show that under Massachusetts law, "the presumed or imminent threat of contamination of the insured property, which renders a property unusable for its intended purposes can constitute a physical loss, without a showing of tangible injury."  (Pl. Opp. at 8; Pl. Sur-Reply at 1-2).

In *Arbeiter*, the court, relying on a single out-of-state case, held that the "existence of

---

[6] Unlike plaintiffs' policies, the policies at issue in *Brunswick Panini's* and *Whiskey Flats* contained virus exclusions.  Those exclusions, however, did not impact the courts' analyses of the availability of Business Income and Extra Expenses coverage.  *See Brunswick Panini's*, 2021 WL 663675, at \*9; *Whiskey Flats Inc.*, 2021 WL 534471, at \*4.

[oil] fumes may be a physical loss."  1998 WL 566658, at *2.  In *Matzner*, the court, again relying on out-of-state precedents, held that "carbon-monoxide contamination constitutes 'direct physical loss of or damage to' property . . . ."  1998 WL 566658, at *3-4.  And in *BloomSouth Flooring*, the First Circuit, relying on *Arbeiter* and *Matzner*, concluded that "odor can constitute physical injury to property under Massachusetts law" and that "allegations that an unwanted odor permeated the building and resulted in a loss of use of the building are reasonably susceptible to an interpretation that physical injury to the property has been claimed."  562 F.3d at 406.[7]

Even if those decisions are correct under Massachusetts law, they do not require a different result.[8]  To the extent there was any "loss of use" of the properties in *Arbeiter*, *Matzner*, and *BloomSouth Flooring*, it was caused by the odor or fumes.  Here, conclusory allegations aside, plaintiffs' loss of use was caused by the government orders; it was not caused by the presence of the coronavirus itself.  *See Torgerson Props., Inc. v. Continental Cas. Co.*, 2021 WL 615416, at *2 (D. Minn. Feb. 17, 2021) ("This case, then, is unlike the case of asbestos contamination, which the Minnesota Court of Appeals found was a 'direct physical loss.' . . . Here, it is not the presence of the virus on the premises that closed TPI's properties (or caused people to stop visiting those properties), but rather the executive orders meant to slow the virus's

---

[7] It is unclear whether the First Circuit's conclusion that "odor can constitute physical injury to property under Massachusetts law" was part of its holding.  The court was not considering a first-party claim for coverage, but instead whether an insurer had a duty to defend.  It specifically explained that it did not "need [to] resolve the ambiguity issue"—whether "direct physical loss" includes "only tangible damage to the structure of the insured property" or "a wider array of losses"—because "the salient question before [the court] involves the lesser burden of determining whether the underlying complaint is 'reasonably susceptible' of stating a covered claim."  *Id.* at 404-05.  In other words, the court did not necessarily see *Matzner* and *Arbeiter* as correct statements of Massachusetts law but instead as support for its conclusion that the phrase "direct physical loss" was "reasonably susceptible" to an interpretation that included odors permeating a property.

[8] There is some reason to question whether those decisions are correct.  Neither *Matzner* nor *Arbeiter* followed an earlier Massachusetts Appeals Court decision stating that the phrase "physical loss or damage" could not be "fairly . . . construed to mean physical loss in the absence of physical damage."  *HRG Dev. Corp. v. Graphic Arts Mut. Ins. Co.*, 26 Mass. App. Ct. 374, 377 (1988) (emphasis omitted); *see also Philadelphia Parking Auth. v. Federal Ins. Co.*, 385 F. Supp. 2d 280, 289 (S.D.N.Y. 2005) (casting doubt on the *Matzner* decision).  *BloomSouth Flooring*, in turn, relied entirely on *Matzner*, *Arbeiter*, and the out-of-state cases which they cited.

14

spread." (internal citation omitted)).  Decisions from Massachusetts courts considering similar

claims have thus distinguished *Arbeiter*, *Matzner*, or *BloomSouth Flooring* in finding a lack of

coverage.  *See Legal Sea Foods*, slip op. at 10 (rejecting plaintiff's argument based on

*BloomSouth Flooring* and *Matzner*); *SAS Int'l, Ltd.*, 2021 WL 664043, at \*4 (distinguishing

*BloomSouth Flooring* and *Matzner*); *Verveine Corp.*, 2020 WL 8766370, at \*4 (distinguishing

*Matzner* and *Arbeiter*).[9]

Plaintiffs also point out that the policies do not include virus exclusions, even though

such exclusions were developed by ISO following the outbreaks of SARS and the avian flu, and

the policies include other ISO exclusions.  (Pl. Opp. at 13-14; Compl. ¶¶ 60-69).  They contend

that defendant therefore "cannot credibly argue that COVID-19 does not cause a direct physical

loss of or damage to property."  (Pl. Opp. at 13).  But "absence of an express exclusion does not

operate to create coverage."  *Given v. Commerce Ins. Co.*, 440 Mass. 207, 212 (2003); *Legal Sea

Foods*, slip op. at 11.  And in any event, it is well-settled that the Court may not consider

extrinsic evidence unless the policies are ambiguous.  *See, e.g.*, *Mack v. Cultural Care Inc.*, 2020

WL 4673522, at \*5 (D. Mass. Aug. 12, 2020) ("While the parties dispute the meaning of the

definitions of 'cover' and 'include' on Defendant's website, the Court does 'not admit parol

evidence to create an ambiguity when the plain language is unambiguous.'" (quoting *General

Convention of New Jerusalem in the U.S.A., Inc. v. MacKenzi*e, 449 Mass. 832, 835 (2007))).

---

[9] *BloomSouth Flooring* also relied on the fact that the odors and fumes "permeated" the properties.  *See* 562 F.3d at 405 ("Suffolk in fact alleged that an unwanted odor 'permeated the building.'" (emphasis omitted)); *id.* at 406 ("[A]lthough Essex may be correct that odor can only constitute physical injury to property if it is permeating or pervasive, nothing in the complaint . . . indicates that the odor was *not* pervasive or permeating.").  By contrast, as plaintiffs allege, the coronavirus does not permeate property; it lives on surfaces, either for a matter of hours or days or until those surfaces are decontaminated.  (*See, e.g.*, Compl. ¶¶ 25-26, 28-29).  Its presence on a property's surface does not alter the property itself in any way.  *See Legal Sea Foods*, slip op. at 8 ("The COVID-19 virus does not impact the structural integrity of property in the manner contemplated by the Policy and thus cannot constitute 'direct physical loss of or damage to' property."); *SAS Int'l, Ltd.*, 2021 WL 664043, at \*4 ("Unlike an unpleasant odor, however, COVID-19 is imperceptible; it does not endure beyond a brief passage of time or a proper cleaning, let alone render the property permanently uninhabitable.").

Here, the plain language of the policies does not create any ambiguity; therefore, they must be enforced according to that language. *See High Voltage Eng'g Corp. v. Federal Ins. Co.*, 981 F.2d 596, 600 (1st Cir. 1992) ("A policy of insurance whose provisions are plainly and definitely expressed in appropriate language must be enforced in accordance with its terms." (quoting *Stankus v. New York Life Ins. Co.*, 312 Mass. 366, 369 (1942))).

As a result, the Court will join the growing number of courts that have concluded that the presence or threat of coronavirus does not constitute a "direct physical loss of or damage to property," even when it or subsequent government orders render that property unusable for its intended purpose. Plaintiffs therefore cannot maintain a claim for coverage under the Business Income and Extra Expense provisions.

## 2.   Allegations of Direct Physical Loss

Even if the presence of coronavirus constituted a "direct physical loss of or damage to property," the complaint fails to plausibly allege that the virus was present at plaintiffs' restaurants. To be sure, it includes allegations concerning coronavirus transmission and the spread of the virus and COVID-19 throughout Massachusetts and the City of Boston. (*See, e.g.*, Compl. ¶¶ 22-33). And it further alleges that the risk of transmission is highest in indoor environments such as restaurants. (*See, e.g.*, *id.* ¶ 33). But the complaint lacks any allegations concerning the actual presence of the virus, or even the presence of individuals infected with COVID-19, at plaintiffs' properties.[10]

---

[10] The complaint's conclusory allegations concerning the "physical loss of or damage to" plaintiffs' properties are insufficient to state a claim. (*See, e.g.*, Compl. ¶ 21 ("Plaintiffs have suffered direct physical loss of or damage to their properties, loss of income, and extra expenses, caused by COVID-19 and by the Civil Authority Orders issued in Massachusetts."); *id.* ¶ 77 ("COVID-19 and the resulting orders issued by Governor Baker have caused and continue to cause Plaintiffs physical loss of or damage to property and business income losses.")). *See Iqbal*, 556 U.S. at 678 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." (internal quotation marks, alterations, and citations omitted)).

Apparently recognizing that deficiency, plaintiffs contend that they are entitled to a reasonable inference that the virus was present at their restaurants.  (Pl. Opp. at 13).  But even considering the highly contagious nature of the virus and its spread in Boston, it is unduly speculative to infer that the virus was present within the confines of plaintiffs' restaurants. District courts faced with similar allegations have declined to engage in such speculation:

> The health data and studies described in the Complaint do not support the conclusory assertion that the virus was present on the surfaces of Plaintiff's property, causing its losses.  The fact that the virus travels through the air and was present in the United States sooner than first suspected, does not support the assertion that it "likely" exists on the surfaces of Plaintiff's property. . . .  [T]here is no allegation that any of these infected individuals were ever present on Plaintiff's property, or that employees or customers came into contact with someone who was infected before entering the property.  To accept Plaintiff's conclusory assertion would be to accept the proposition that any business located in a community with COVID-19 infections was likely contaminated with the virus.

*Promotional Headwear Int'l v. Cincinnati Ins. Co.*, 2020 WL 7078735, at *8 (D. Kan. Dec. 3, 2020) (internal footnotes and citations omitted); *see, e.g.*, *Johnson v. Hartford Fin. Servs. Grp., Inc.*, 2021 WL 37573, at *5 (N.D. Ga. Jan. 4, 2021) ("[C]ritically, beyond this conclusory statement the Amended Complaint does not allege that COVID-19 ever actually entered into the dental offices.  The Amended Complaint likewise does not point to any instance of an employee or patient contracting the virus where it was traced to the properties. . . .  They instead rely solely on speculation:  *i.e.*, due to the exceedingly high number of COVID-19 cases in Georgia and ease of person-to-person transmission during the relevant time period, COVID-19 must have somehow found its way into the offices." (emphasis and internal footnotes omitted)); *Terry Black's Barbecue*, 2020 WL 7351246, at *7 ("Plaintiffs do not allege that the virus that causes COVID-19 was ever present at either of their restaurants.  Plaintiffs merely speculate that the virus could have been present because of its prevalence in Austin and Dallas.  Such conclusory allegations are insufficient to state a plausible claim that Plaintiffs' property was damaged."

17

(internal citation omitted)).[11]

Plaintiffs further contend that it is reasonable to infer that the coronavirus was present at their restaurants in light of the government orders limiting the use of restaurants. (Pl. Opp. at 13). But the orders did not apply only to businesses that were previously or presently contaminated with the coronavirus; they applied to businesses across the state, regardless of whether there was evidence of contamination. The orders were intended, as discussed below, to slow future transmission of the virus, not to remedy past transmission. As a result, the orders do not make any more reasonable an inference that the coronavirus was present at plaintiffs' properties.

*      *      *

In sum, the threat or presence of the coronavirus in the restaurants does not constitute "direct physical loss of or damage to property." Even if it did, the complaint does not provide a sufficient factual basis to suggest that coronavirus was actually present at plaintiffs' properties. Furthermore, the Governor's orders closing or limiting the business of the restaurants likewise did not result in a direct physical loss or damage. Accordingly, the Court will grant defendant's motion to dismiss as to Count 1 and Count 2 insofar as they depend on claims for Business Income and Extra Expense coverage.

## B.    Civil Authority Coverage

Defendant also contends that the complaint fails to state a claim for coverage under the

---

[11] In the "outlier cases" that have allowed similar complaints to survive dismissal, *SAS Int'l, Ltd.*, 2021 WL 664043, at *5, the relevant allegations went somewhat beyond those in the complaint here. *See, e.g.*, *Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794, 798 (W.D. Mo. 2020) (denying insurer's motion to dismiss where the complaint alleged that "it is likely that customers, employees, and/or other visitors to the insured properties were infected with COVID-19 and thereby infected the insured properties with the virus"); *Blue Springs Dental Care, LLC v. Owners Ins. Co.*, 2020 WL 5637963, at *4 (W.D. Mo. Sept. 21, 2020) (finding allegation that "it is likely customers, employees, and/or other visitors to the insured properties over the recent month were infected with the coronavirus" sufficient to allege a direct physical loss).

Civil Authority provision.  In particular, it contends that the orders do not completely prohibit access to plaintiffs' restaurants and that the orders were not issued as a result of damage to property.

To state a claim for coverage under the Civil Authority provision, plaintiffs must allege that (1) "a Covered Cause of Loss cause[d] damage to property other than property" at the insured premises; (2) "[a]ccess to the area immediately surrounding the damaged property [was] prohibited by civil authority as a result of the damage," and the insured premises is "within that area but . . . not more than one mile from the damaged property;" (3) the "action of civil authority . . . prohibit[ed] access" to the insured premises and caused a loss of business income and extra expenses; and (4) "[t]he action of civil authority [was] taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action [was] taken to enable a civil authority to have unimpeded access to the damaged property."  (Kamakura Policy at 95; Atlántico Policy at 94).

Here, the complaint does not allege that the orders were issued as a result of damage to other property.  First, it does not identify any other property that was damaged.  As discussed, the mere presence of the coronavirus does not constitute property damage.  *See SAS Int'l Ltd.*, 2021 WL 664043, at *4 n.4 ("[N]o reasonable construction of the phrase 'direct physical loss,' however broad, would cover the presence of the virus."); *Verveine Corp.*, 2020 WL 8766370, at *5 (concluding that the complaint failed to state a claim for civil-authority coverage because, among other things, it "failed to allege damage to property, either at [plaintiffs'] restaurants or at any other building within a mile thereof").[12]

_____

[12] The complaint alleges that "property within one mile of Plaintiffs' insured locations has suffered direct physical loss of or damage to property caused by COVID-19."  (Compl. ¶ 21; *see also id.* ¶ 131 ("COVID-19-related direct physical loss of or damage to properties within a one mile radius of Kamakura's[,] [Atlántico's,] and the Classes' premises caused civil authorities to prohibit access to Plaintiff Kamakura's and Atlántico's and the Classes'

Second, even if the presence of coronavirus constituted property damage, the complaint includes only general allegations concerning the presence of the virus in Massachusetts and the City of Boston.  (*See, e.g.*, Compl. ¶¶ 22-24).  It fails to identify a specific "damaged property." The Civil Authority provision, however, plainly contemplates an identifiable "damaged property."  It provides coverage only when "[a]ccess to the area immediately surrounding the damaged property is prohibited" and the insured premises is "within that area but . . . not more than one mile from the damaged property."  (Kamakura Policy at 95; Atlántico Policy at 94). Without identifying the damaged property, it is impossible for claimants to satisfy those requirements.

Indeed, the complaint alleges neither that access to an area immediately surrounding some specific damaged property was prohibited nor that the insured premises are within that area and less than one mile from the damaged property.  In fact, it could not.  The orders do not prohibit access to an area surrounding an identifiable damaged property.  Instead, they prohibit particular uses of properties.  If Civil Authority coverage were available absent a specific and identifiable damaged property, that coverage would extend without geographic limitation—in this case, for insured premises across the entire state—something that the language of the provision plainly does not contemplate.

Plaintiffs contend that the complaint "plausibly alleges that the virus was present within a one-mile area of Plaintiffs' restaurants" considering the complaint's allegations concerning "the deadly nature of the virus and how it is rapidly spread" and its presence "throughout the City of Boston and Massachusetts."  (Pl. Opp. at 18).  But Civil Authority coverage is not triggered

---

premises.")).  But again, such conclusory allegations are not sufficient to survive a motion to dismiss.  *See Iqbal*, 556 U.S. at 678.

when the virus is within one mile of plaintiffs' restaurants; instead, it is triggered when plaintiffs' restaurants are within an area to which a civil authority has prohibited access.  And wholly absent from the complaint are allegations concerning any specific damaged property and restrictions on access surrounding that property.[13]

Third, even if the complaint sufficiently alleged damage to a specific property, the orders were not issued "as a result of" that damage or "in response to the dangerous physical conditions resulting from" that damage.  (Kamakura Policy at 95; Atlántico Policy at 94).  Courts interpreting similar civil-authority provisions have made clear that there must exist a causal link between the damage to the other property and the issuance of the orders.  *See, e.g.*, *Dickie Brennan & Co. v. Lexington Ins. Co.*, 636 F.3d 683, 685-87 (5th Cir. 2011) (requiring "a causal link between prior damage and civil authority action"); *United Air Lines, Inc. v. Insurance Co. of State of Pa.*, 439 F.3d 128, 134-35 (2d Cir. 2006) (examining whether the relevant orders were the "direct result" of damage to adjacent premises).  That causal link is absent when "the only relevance of prior damage to other property . . . is to provide a basis for fearing future damage to the area where the insured property is located."  *South Texas Med. Clinics v. CNA Fin. Corp.*, 2008 WL 450012, at *10 (S.D. Tex. Feb. 15, 2008); *see also United Air Lines*, 439 F.3d at 135 n.7 ("[T]he attack on the Pentagon 'caused' the shutdown only in the sense that it made the government fearful of future attacks.").

Plaintiffs contend that "the civil authority orders were issued in response to the dangerous physical condition of COVID-19 in the air and on surfaces in indoor environments such as

_____

[13] Plaintiffs point out that "the Complaint specifically alleges that the virus was spread from a super-spreader event at the Marriott Long Wharf Hotel, which was within a mile of Kamakura."  (Pl. Opp. at 18 n.9 (citing Compl. ¶ 23)).  But that property cannot constitute the "damaged property" for the purposes of Civil Authority coverage, because the orders did not restrict access to any area around that property.

restaurants in Massachusetts." (Pl. Opp. at 19). But the orders were in fact preventative measures. They were issued to minimize future spread of the coronavirus rather than to respond to the fact that it had already spread across Massachusetts and the City of Boston. (*See, e.g.*, Compl. ¶ 34 (alleging that the orders constitute "efforts to slow the spread of COVID-19"); *id.* ¶ 50 ("The orders issued by Governor Baker were issued because of, among other things, the spread of COVID-19 and the transmission of the virus through human contact with affected property.")). Indeed, the orders were not limited to property that had been affected by the coronavirus or that was near other property that had been so affected. Because the orders were intended to minimize future damage rather than to respond to past damage, the complaint fails to state a claim for Civil Authority coverage. *See Dickie Brennan*, 636 F.3d at 685-87 (finding no civil-authority coverage for claim based on mandatory evacuation order that was issued "because of anticipated high lake and marsh tides due to the tidal surge, combined with the possibility of intense thunderstorms, hurricane force winds, and widespread severe flooding"); *United Air Lines*, 439 F.3d at 134-35 (concluding that the suspension of flights after 9/11 was "based on fears of future attacks," not the "direct result" of damage to adjacent premises, and therefore not covered by civil-authority provision).

Most courts have come to the same conclusion when considering claims for civil-authority coverage based on comparable COVID-19 orders. *See, e.g.*, *Wellness Eatery La Jolla LLC v. Hanover Ins. Grp.*, 2021 WL 389215, at *8 (S.D. Cal. Feb. 3, 2021) ("[T]he text of the Closure Orders makes clear that they were issued as general precautionary measures 'to slow the pace of community spread and avoid unnecessary strain on our medical system', to 'take precautions to prevent the spread of COVID-19', and '[t]o preserve the public health and safety, and to ensure the healthcare delivery system is capable of serving all, and prioritizing those at the

highest risk and vulnerability.'  Nowhere is the presence of COVID-19 in the surrounding areas

of Wellness Eatery cited as the impetus for the Closure Orders.  Accordingly, for the reasons

stated, the Court finds that Plaintiffs have not alleged a covered loss under the civil authority

provision." (internal citations omitted)); *Elegant Massage, LLC v. State Farm Mut. Auto. Ins.

Co.*, 2020 WL 7249624, at *11 (E.D. Va. Dec. 9, 2020) ("[T]he Civil Authority Coverage does

not apply because Plaintiff has not shown a causal link between any physically damaged or

dangerous surrounding properties proximate to the insured property and a civil authority

prohibiting Plaintiff's from accessing or using their property.  That is, the Executive Orders were

issued because 'COVID-19 presents an ongoing threat to [Virginia] communities', and not

because of prior actual 'physical damage' to its own property or surrounding properties."); 

*Mudpie, Inc. v. Travelers Cas. Ins. Co.*, 2020 WL 5525171, at *7 (N.D. Cal. Sept. 14, 2020)

("Mudpie's allegations establish that the government closure orders were intended to prevent the

spread of COVID-19.  Because the orders were preventative—and absent allegations of damage

to adjacent property—the complaint does not establish the requisite causal link between prior

property damage and the government's closure order." (internal citation omitted)).  *But see, e.g.*,

*Salon XL Color & Design Grp., LLC v. W. Bend Mut. Ins. Co.*, 2021 WL 391418, at *3 (E.D.

Mich. Feb. 4, 2021) ("Salon XL has alleged that Governor Whitmer issued the order due to the

spread of COVID-19 throughout Michigan, including their premises and at property within a

one-mile radius of the insured premises.  This is a sufficient pleading to establish a causal nexus

between the Executive Order and COVID-19's presence at the insured property and properties

within a one-mile radius of it to survive a motion to dismiss." (internal citation omitted)).[14]

---

[14] The policies at issue in *Wellness Eatery*, *Elegant Massage*, *Mudpie*, and *Salon XL* contained virus exclusions, but those exclusions did not impact the courts' analyses of the availability of civil-authority coverage.

Finally, even if the complaint alleged that the orders were issued as a result of damage to other property, it would nevertheless fail to state a claim for Civil Authority coverage because the orders did not prohibit access to plaintiffs' properties.  The orders prohibited plaintiffs from using their properties for certain purposes, but they did not prohibit employees or customers from accessing the properties.  (*See, e.g.*, Def. Mem. Ex. 1, at 4 ("Any restaurant, bar, or establishment that offers food or drink shall not permit on-premises consumption of food or drink; provided that such establishments may continue to offer food for take-out and by delivery provided that they follow the social distancing protocols set forth in Department of Public Health guidance.")).[15]  Restaurants were in fact "encouraged to continue to offer food and beverages for take-out and by delivery provided that they follow the social distancing protocols set forth in Department of Public Health guidance." (*Id.* at 6).  Plaintiffs' claims therefore fall outside the scope of the Civil Authority coverage.  *See Legal Sea Foods*, slip op. at 13 ("Although Legal alleges that the Orders mandated the closure of and prohibited access to some of its insured restaurants, plaintiff fails to identify any specific Order that expressly and completely prohibited access to any of the Designated Properties."); *Verveine Corp.*, 2020 WL 8766370, at *5 ("[P]laintiffs, their employees, and their customers have not been prohibited from accessing the insureds' restaurants, a fact the Complaint plainly concedes.  Rather, the scope of permitted use of those physical spaces was altered by the Governor's Orders.  Plaintiffs still had access to the premises to prepare food and for takeout and delivery."); *see also Equity Planning Corp. v. Westfield Ins. Co.*, 2021 WL 766802, at *17 (N.D. Ohio Feb. 26, 2021) ("E.P. also fails to allege

---

*See Wellness Eatery La Jolla*, 2021 WL 389215, at *8 n.8; *Elegant Massage*, 2020 WL 7249624, at *11; *Mudpie, Inc.*, 2020 WL 5525171, at *7 n.9; *Salon XL Color & Design Grp.*, 2021 WL 391418, at *3-4.

[15] Again, the Court does not consider the complaint's conclusory allegations to the contrary.  (*See, e.g.*, Compl. ¶ 72 ("The orders have operated to prohibit access to Plaintiffs' insured locations as well as other places throughout the Commonwealth.")).  *See Iqbal*, 556 U.S. at 678.

that an action of civil authority 'prohibit[ed],' blocked, or prevented E.P. from accessing its premises.  In other words, while E.P. alleges that Ohio's Stay At Home Order prevented E.P. from making 'full use of' its Property when its tenants were required to partially or completely close, the Stay At Home Order did not prevent E.P. from accessing its properties altogether." (internal citation omitted)); *First Watch Restaurants, Inc. v. Zurich Am. Ins. Co.*, 2021 WL 390945, at *4 (M.D. Fla. Feb. 4, 2021) ("[T]he governors' orders did not completely cut off access to the restaurant because First Watch was permitted to offer take-out and delivery. Merely restricting access, without completely prohibiting access, does not trigger coverage under these sorts of provisions." (internal citation omitted)); *Wellness Eatery La Jolla*, 2021 WL 389215, at *7 ("[T]he civil authority coverage provision provides coverage only to the extent that access to Plaintiffs' physical premises is prohibited—not if Plaintiffs are merely prohibited from operating the on-site consumption aspect of their business.  Simply stated, the Closure Orders alleged in the complaint prohibit the on-site dining operation of Plaintiffs' business; they do not prohibit physical access to Plaintiffs' premises.").

Accordingly, the Court will grant defendant's motion to dismiss as to Count 1 and Count 2 insofar as they depend on claims for Civil Authority coverage.

### C.    Mass. Gen. Laws Chapter 93A

The complaint alleges that defendant violated Mass. Gen. Laws ch. 93A by refusing to pay plaintiffs' claims "without conducting a reasonable investigation based upon all the information available" and by "fail[ing] to effectuate prompt, fair and equitable settlements" of plaintiffs' claims "in which liability has become reasonably clear."  (Compl. ¶ 138).

Chapter 93A makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2(a).  Chapter 176D catalogues "unfair methods of competition and unfair or deceptive acts or practices in the business of insurance."

25

Mass. Gen. Laws ch. 176D, § 3.  Those practices include unfair claim-settlement practices, such as failing to promptly and reasonably investigate claims, failing to timely affirm or deny coverage of claims, and failing to pay claims or make reasonable settlement offers once liability has become reasonably clear.  *See id.* § 3(9).  The SJC has concluded that "a violation of General Laws chapter 176D, § 3 . . . is evidence of an unfair business practice under chapter 93A, § 2, which would give rise to a cause of action under chapter 93A, § 11."  *Federal Ins. Co. v. HPSC, Inc.*, 480 F.3d 26, 35 (1st Cir. 2007) (citing *Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 754-55 (1993); *Peterborough Oil Co. v. Great Am. Ins. Co.*, 397 F. Supp. 2d 230, 244 (D. Mass. 2005)).

To determine whether a business practice is unfair under Chapter 93A, courts must consider "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)."  *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975) (internal quotation marks and citation omitted).  To be actionable under section 11, the conduct in question must constitute an "extreme or egregious" business wrong or "commercial extortion," or rise to some similar level of "rascality" that raises "an eyebrow of someone inured to the rough and tumble of the world of commerce."  *Peabody Essex Museum, Inc. v. United States Fire Ins. Co.*, 802 F.3d 39, 54 (1st Cir. 2015) (citing *Baker v. Goldman Sachs & Co.*, 771 F.3d 37, 49-51 (1st Cir. 2014); *Zabin v. Picciotto,* 73 Mass. App. Ct. 141, 169 (2008)).  In cases involving insurance disputes, the presence of extortionate tactics and the absence of good faith "generally characterize" actions under Chapters 93A and 176D.  *See Guity v. Commerce Ins. Co.*, 36 Mass. App. Ct. 339, 344 (1994).

Those chapters, however, do not impose liability in cases of good-faith disputes over insurance coverage in which liability is "not reasonably clear."  *Id.* at 343.  Such disputes do not constitute unfair or deceptive trade practices, even if a court ultimately overrules the insurer's denial of a claim, as long as that denial was made in good faith, based upon a plausible interpretation of the insurance policy, and was not otherwise immoral, unethical, or oppressive.  *See, e.g.*, *New England Envtl. Techs. v. American Safety Risk Retention Grp., Inc.*, 738 F. Supp. 2d 249, 259 (D. Mass. 2010) ("Because [the insurer] based its denial on a plausible, albeit erroneous, interpretation of the policy language, its conduct did not constitute a violation of Chapter 176D."); *Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co.*, 406 Mass. 7, 15 (1989) ("In good faith, [the insurer] relied upon a plausible, although ultimately incorrect, interpretation of its policy.  There is nothing immoral, unethical or oppressive in such an action. . . . We hold that [the insurer] did not engage in unfair or deceptive acts in this case."); *Guity*, 36 Mass. App. Ct. at 343 ("A plausible, reasoned legal position that may ultimately turn out to be mistaken—or simply, as here, unsuccessful—is outside the scope of the punitive aspects of the combined application of c. 93A and c. 176D.").

Here, defendant correctly denied coverage under the policies.  Massachusetts trial and appellate courts have repeatedly ruled that, when an insurer correctly denies coverage, Chapter 93A claims related to that denial cannot survive.  *See, e.g.*, *Legal Sea Foods*, slip op. at 15 ("The Court has concluded that Strathmore correctly denied coverage under the Policy.  Therefore, dismissal of the Chapter 93A claim is warranted."); *Styller v. National Fire & Marine Ins. Co.*, 95 Mass. App. Ct. 538, 546 (2019) ("When coverage has been correctly denied, as in this case, no violation of the Massachusetts statutes proscribing unfair or deceptive trade practices may be found." (quoting *Transamerica Ins. Co. v. KMS Patriots, L.P.*, 52 Mass. App. Ct. 189, 197

(2001))); *Entwistle v. Safety Indem. Ins. Co.*, 2015 WL 1602599, at *7 n.13 (Mass. Sup. Ct. Mar. 31, 2015) ("Given my conclusion that York properly applied its policy's 10% sub-limit, it could not have violated [Chapter 93A] on the facts of this case."); *Metropolitan Life Ins. Co. v. Cotter*, 2011 WL 2367906, at *14 (Mass. Sup. Ct. Feb. 7, 2011) ("An insurer which correctly denies a claim has not violated either [Chapter 93A or Chapter 176D].").[16]

Even if defendant's denials were mistaken, the complaint alleges nothing more than a good-faith dispute over interpretations of the insurance policies. Such disputes are "not the stuff of which a [Chapter 93A] claim is made." *Duclersaint v. Federal Nat. Mortg. Ass'n*, 427 Mass. 809, 814 (1998) (citing *Kobayashi v. Orion Ventures, Inc.,* 42 Mass. App. Ct. 492, 505 (1997); *Framingham Auto Sales, Inc. v. Workers' Credit Union,* 41 Mass. App. Ct. 416, 418 (1996)). Because the denials were based on plausible understandings of the policies, they are not actionable under Chapter 93A. *See New England Envtl. Techs.*, 738 F. Supp. 2d at 259; *Boston Symphony Orchestra, Inc*, 406 Mass. at 15; *Guity*, 36 Mass. App. Ct. at 343.

Plaintiffs nonetheless contend that the allegations in the complaint go beyond a disagreement concerning policy interpretation. Specifically, they contend that "GNY acted in bad faith in rejecting Plaintiffs' claims without any investigation to avoid COVID-19 losses." (Pl. Opp. at 20). The complaint alleges that defendant's denials of plaintiffs' claims "without conducting an appropriate review of the properties, as well as how swiftly GNY denied Plaintiffs' claims demonstrate that GNY did not engage in a good faith or reasonable

---

[16] That expression of a categorical rule may somewhat oversimplify Massachusetts law, as there may be unusual circumstances where such a claim under Chapter 93A might survive even if there is no coverage under the policy. For example, in *Jet Line Services, Inc. v. American Employers Insurance Co.*, 404 Mass. 706 (1989), the Supreme Judicial Court found that an insurer that correctly disclaimed coverage still violated Chapter 93A by leading the insured to believe that coverage was available. *See id.* at 710-17. Indeed, the First Circuit, relying on *Jet Line Services*, has stated that "[a] party is not exonerated from chapter 93A liability because there has been no breach of contract." *NASCO, Inc. v. Public Storage, Inc.*, 127 F.3d 148, 152 (1st Cir. 1997).

investigation of the claims which would have included an assessment of facts or issues relevant to the Plaintiffs' premises."  (Compl. ¶ 94; *see also id.* ¶ 138 ("GNY has refused to pay the claims of Kamakura, Atlántico and members of the Massachusetts Subclasses without conducting a reasonable investigation based upon all the information available . . . .")).

But it is not clear from the complaint what made defendant's investigation, or lack of investigation, unreasonable.  It alleges that defendant did not inspect the premises or documents concerning plaintiffs' business activities.  (*Id.* ¶¶ 81, 90).  But because defendant's denials were based on policy interpretations, not factual findings, it is not clear what would make those actions unreasonable under the circumstances.  The facts underlying the claims, much like the facts underlying the present lawsuit, are largely, if not entirely, undisputed.  And the speed with which defendant denied plaintiffs' claims cannot support a claim for unfair or deceptive trade practices.  In fact, insurance companies risk liability under Chapter 93A and Chapter 176D when they do not timely affirm or deny claims.  *See* Mass. Gen. Laws ch. 176D, § 9 ("An unfair claim settlement practice shall consist of . . . [f]ailing to acknowledge and act *reasonably promptly* upon communications with respect to claims arising under insurance policies; . . . [f]ailing to adopt and implement reasonable standards for the *prompt investigation* of claims arising under insurance policies; . . . [f]ailing to affirm or deny coverage of claims *within a reasonable time* after proof of loss statements have been completed; . . . or [f]ailing to provide *promptly* a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement." (emphases added)).  In short, because the allegations in the complaint amount to nothing more than a good-faith dispute over policy interpretation, they do not state a claim under Chapter 93A.[17]

---

[17] The complaint further alleges that defendant violated Chapter 93A by "fail[ing] to effectuate prompt, fair and equitable settlements of Kamakura's, Atlántico's, and the Massachusetts Subclasses' claims in which liability

Accordingly, the Court will grant defendant's motion to dismiss as to Count 3.

## IV.    **Conclusion**

For the foregoing reasons, defendant's motion to dismiss is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV

Dated:  March 9, 2021                Chief Judge, United States District Court

---

has become reasonably clear."  (Compl. ¶ 138).  Plaintiffs do not rely on that allegation in their opposition and therefore appear to have abandoned it.  In any event, when a defendant concludes in good faith that claims are not covered, liability is not "reasonably clear."  Mass. Gen. Laws ch. 176D, § 3(9)(f).  It is therefore not obligated to settle such claims.  *See Capitol Specialty Ins. Corp. v. Higgins*, 203 F. Supp. 3d 200, 213 (D. Mass. 2016) ("Under Chapter 176D, the duty to settle does not arise until liability has become reasonably clear.") (citing *Clegg v. Butler*, 424 Mass. 413, 421 (1997)); *Zahiri v. General Accident Ins. Co.*, 2002 WL 2021576, at *5 (Mass. App. Ct. Sept. 4, 2002) (unpublished) ("There is nothing in the record to show that General Accident acted in violation of G.L. c. 93A by engaging in unfair or deceptive insurance practices as defined by G.L. c. 176D, § (3)(9), when it did not make a reasonable settlement offer where it believed in good faith no liability existed.") (citing *Doe v. Liberty Mut. Ins. Co.*, 423 Mass. 366, 372 (1996)).